**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JAMES A. HENSON, JR. | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. JKB-17-0886 |
| RICHARD J. GRAHAM, JR., *et al*., | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

Pending is a motion to dismiss or, in the alternative, motion for summary judgment filed by defendants Warden Richard Graham Jr., Chief of Security Bradley Butler, Lieutenant James Smith, Sergeant Jerry Broadwater, CO II Steven Wilson, Assistant Warden Ronald S. Weber, Correctional Case Management Specialist Shawn Gainer, Major Denny Mellot, and Melanie Gordon, MHP Counselor.[1] ECF 19. Plaintiff has responded. ECF 25.[2] Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, defendants' dispositive motion will be granted.

## I. Background

The case was instituted upon receipt of a civil rights complaint filed by plaintiff James Henson, an inmate currently confined at the Western Correctional Institution ("WCI"). ECF 1. Plaintiff named as defendants Warden Richard J. Graham, Jr., Chief of Security Bradley O. Butler, Lieutenant J. Smith, Sergeant J. Broadwater, Steve A. Wilson, Ronald Shane Weber,

---

[1] The Clerk shall amend the docket to reflect the correct spellings of defendants' names.

[2] Plaintiff's filings are difficult to decipher. To the extent plaintiff's response raises new claims, such claims are not properly before the court and will not be considered in the context of this opinion.

Mrs. Gordon, Nurse Monica,[3] Mrs. Gainer, and Major D. Mellot. ECF 1 at 1. Plaintiff states that WCI prison authorities conspired to destroy his outgoing correspondence, six-month financial printout, and affidavits from witnesses that he intended to file in the Circuit Court for Allegany County, Maryland. *Id*. at 3. He attaches to his complaint a copy of an administrative remedy form ("ARP") dated March 27, 2017 (WCI 714-17), alleging that prison authorities have destroyed his outgoing mail. ECF 1-1.

Plaintiff also alleges in his complaint that unspecified "guards" continue to put him in life threatening situations, with known violent criminals in retaliation for his having used the prison grievance system. *Id*. In ARP WCI-2872-16, attached to plaintiff's complaint,[4] he alleges that in December of 2016, Wilson and Broadwater forced him into a cell with inmate Geral Griffin who sexually assaulted him. ECF 1-4. As relief, plaintiff seeks access to the courts and medical treatment. ECF 1 at 3.

---

[3]     Nurse Monica has not been served with the complaint. Plaintiff does not explain how Nurse Monica tampered with his mail and deprived him of access to the courts or failed to protect him from harm. The complaint against her shall be dismissed without prejudice.

[4]     Plaintiff attached to his complaint as exhibits numerous administrative remedy requests ("ARPs"), which are either unrelated to the allegations in his complaint or concern matters plaintiff alleged in other civil rights complaints filed with this court.

ECF 1-2 and ECF 1-3 describe the alleged improper dissemination of information about plaintiff's underlying criminal conviction and federal civil rights cases. ARP NBCI-2158-16, dated October 10, 2016, concerns plaintiff's allegations that staff at the North Branch Correctional Institution conspired to give other inmates his prison number and information surrounding his conviction. ECF 1-2. ARP NBCI 2158-16, dated September 26, 2016, alleges that correctional staff provided inmates information regarding his federal cases. ECF 1-3. These matters were before the court in *Henson v. Miller, et al*., Civil Action No. 16-3404 (D. Md.).

ARP WCI 1357-17, dated February 6, 2017, concerns plaintiff's claim that an unidentified nurse provided improper medical care during a blood draw. ECF 1-5. Plaintiff raised this same claim in *Henson v. Gilmore*, Civil Action No. 17-506 (D. Md.).

As the allegations raised in these ARPs do not concern the defendants named in this civil rights case, and as the matters were litigated by plaintiff in other civil matters, these claims will not be considered here.

Since the filing of this complaint, plaintiff has filed numerous letters with the court. ECF 8, 10, 12-18. After the receipt of defendants' dispositive motion, he filed numerous "supplemental exhibits." ECF 21-24, 26-28. Together, these documents contain the litany of plaintiff's complaints concerning the entirety of his incarceration.[5] The filings are difficult to decipher as plaintiff regularly files documents previously submitted in other cases and writes across them and around the margins. He references cases, administrative grievances, and filings dating back to the early 2000s. The filings refer to plaintiff's numerous previously filed cases to support his allegations of regular and continuous problems with prison staff. Those complaints, to the extent they have previously been litigated, will not be considered here.[6] Lastly, to the

---

[5]    Plaintiff's claims of a far reaching conspiracy have been investigated and found unsubstantiated, resulting in the dismissal of the claims both administratively and judicially. *See e.g. Henson v. Likin*, Civil Action No. RWT-11-2719 (D. Md.); *Henson v. Miller*, Civil Action No. RWT-12-763 (D. Md.); *Henson v. Lambert*, Civil Action No. RWT-12-3271 (D. Md.); *Henson v. Smith, et al.,* Civil Action No. RWT-13-2266 (D.Md.); *Henson v. Bishop*, RDB-14-2131 (D. Md.) (dismissing for failure to exhaust administrative remedies but noting affidavits of all correctional staff that they had not submitted false incident reports, encouraged the submission of falsified medical reports, or instructed anyone to house plaintiff with violent, dangerous gang members). Those claims will not be addressed again.

    Plaintiff's claim regarding the denial of medical care is currently pending before the court and also will not be considered in the context of this opinion. *See Henson v. McLaughlin, et al*., Civil Action No. JKB-17-1665 (D. Md.).

[6]    Plaintiff has filed numerous cases alleging correctional employees intentionally placed him in cells with dangerous inmates. He has been unsuccessful in these claims. Plaintiff previously filed suit regarding an assault as well as allegations concerning Correctional Officers Wilson, Merling, Lark, and Weber assigning him to a cell with Inmate Jenkins, an alleged "professed racist." *See Henson v. Likin*, Civil Action No. RWT-11-2719 (D. Md.). Defendants were granted summary judgment in that case.

    Plaintiff previously filed suit against CO II Jesse Lambert, CO II Nicholas Soltas, CO II Steven Miller, CO II Randolph Bennett, CO II Christopher Ortt, CO II Joshua Tart, and CO II Shawn Murray, alleging they assigned him to cells with gang members and advised gang members on the unit that plaintiff was a rapist. He reiterated his claim regarding the assault by Jenkins and sought protective custody and a federal investigation. *See Henson v. Lambert,* Civil Action No. RWT-12-3271. Defendants were granted summary judgment in that case.

    Plaintiff's previously filed suit against Lt. Dale Smith, Case Worker Gainer, Caseworker Sindy, Lt. Miller, Sgt. Iser, Sgt. Guilliam, Sgt. Tyndale, again alleging overall failure to protect and lack of a policy to address risks to plaintiff's health and safety and an overarching conspiracy, was likewise dismissed. *See Henson v. Smith*, Civil Action No. RWT-13-2266 (D. Md.).

extent the documents refer to events occurring after the specific events complained of in plaintiff's initial complaint, they are not properly before the court and also will not be considered.

## B. Defendants' Response

### 1. Administrative Remedies

Plaintiff filed an administrative remedy on March 27, 2017 (WCI-0714-17), raising the same allegations as he does in the instant complaint concerning the destruction of his outgoing mail addressed to the Circuit Court for Allegany County. ECF 1 at 3; ECF 19-3, p. 15. The ARP was dismissed on March 28, 2017, for having not been filed in the appropriate time frame. ECF 19-3, p. 15. The instant case was filed on March 31, 2017. Plaintiff filed a headquarters appeal to the Commissioner of Corrections on April 1, 2017. *Id*., at 16. The appeal was dismissed on April 7, 2017. *Id.*

---

Plaintiff also previously sued Warden Frank B. Bishop, Jr., Lt. William E. Miller, Major Robert M. Friend, Lt. Bradley Wilt, Sergeant Walter Iser, CO II Jesse L. Lambert, CO II Christopher Anderson, CO II Nicolas Soltas, and CO II Steven Miller alleging that he was the target of a campaign of murder carried out by correctional staff and specifying an assault on June 20, 2014. *See Henson v. Bishop*, Civil Action No. RDB-14-2131 (D. Md.). Defendants were granted summary judgment in that case.

Plaintiff sued Lt. Sawyer and unnamed members of Housing Unit 2, alleging they subjected him to excessive force and placed him in cells with known criminals in order to cause him harm. Sawyer's motion for summary judgment was granted. *See Henson v. Sawyer, et al.,* RDB-16-0053 (D. Md.).

Other complaints raising bald conspiracy claims were dismissed *sua sponte* by the Court. *See Henson v. Wilt, et al.*, Civil Action No. RDB-14-3724 (D. Md.); *Henson v. Friend et al.,* Civil Action No. RDB-14-3825 (D. Md.), and *Henson v. Miller et al.*, Civil Action No. RDB-15-28 (D. Md.).

Where there has been a final judgment on the merits in a prior suit, an identity of the cause of action in both the earlier and the later suit, and an identity of parties or their privies in the two suits, *res judicata* is established. *See Pension Ben. Guar. Corp. v. Beverley*, 404 F. 3d 243, 248 (4th Cir. 2005). The doctrine of *res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by parties on the same cause of action. *See Meekins v. United Transp. Union*, 946 F. 2d 1054, 1057 (4th Cir. 1991). In addition, "'[n]ot only does *res judicata* bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Id.*, quoting *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F. 2d 355, 359 (4th Cir. 1989).

Plaintiff filed ARP WCI 2872-16 on December 22, 2016, concerning the sexual assault upon him by his cellmate. ECF 19-3, p. 33. The ARP was dismissed on December 27, 2016, as containing matters outside of the process. *Id*. His headquarters appeal was dismissed on January 12, 2017. *Id*., p. 35.

**2.    Mail Claims**

Robin Wotring, Mail Room Officer Clerk II at WCI, avers that the mailroom processes plaintiff's mail in accordance with Department of Public Safety and Correctional Services procedures. ECF 19-3, p. 13, ¶¶ 2, 3 (Wotring Decl.); ECF 19-3, pp. 61-75 (Executive Directive OPS.250.0001 § 05D). Wotring states that, to her knowledge, plaintiff's mail was never withheld, delayed, or not processed so long as the mail was in compliance with approved DPSCS policies and directives. ECF 19-3, p. 13, ¶ 4. Wotring explains that mail arriving at the NBCI/WCI mailroom is logged and forwarded to the proper housing unit for distribution to the inmates. ECF 19-3, p.14, ¶ 5. A "legal log record" is maintained by mailroom staff documenting the name and DOC number of the inmate receiving the legal mail, the name of the sender, the date the document was received by the institution, and the signature of the inmate indicating receipt of the document. *Id*. In the case where legal mail is returned to the institution due to having an incorrect address or incorrect postage, the mail is logged and handled as legal mail. The mail is returned to the inmate, unopened, for him to sign the log and to open in the presence of custody staff. ECF 19-3, p. 14, ¶ 7. Outgoing mail is logged only if sent by indigent inmates. *Id*., ¶ 5.

Wotring avers that, to the best of her knowledge, neither she nor anyone employed in the mailroom has hindered the delivery of or the sending of plaintiff's mail. *Id.*, ¶ 6. Plaintiff's mail is handled the same as all the other inmates' mail. *Id.*

Plaintiff sent and received over 166 pieces of mail from February 1, 2017, through August 2, 2017. ECF 19-3 at 76-131 (Legal mail log for plaintiff from February 1, 2017, to August 2, 2017). Moreover, the Circuit Court for Allegany County received mail from plaintiff during the time at issue. ECF 19-2.

Butler and Smith each aver that they did not destroy plaintiff's mail or instruct anyone to destroy plaintiff's mail. ECF 19-3, p. 10, ¶ 6; ECF 19-3, ¶ 12, ¶ 6. Gordon and Gainer also specifically deny handling inmate mail or destroying or otherwise tampering with plaintiff's mail. ECF 19-3, p. 7. ¶ 3; ECF 19-3, p. 6, ¶ 13.

### 3.      Failure to Protect

Shawn Gainer, Correctional Case Management Specialist at WCI, states that the Case Management Department maintains records of validated inmate enemies throughout DPSCS. ECF 19-3, p. 4, ¶¶ 1, 3 (Gainer Decl). Enemy alerts are maintained by case management staff in accordance with the Case Management Manual-DOC 100.0002. *Id.*, ¶ 4; *see also* ECF 19-3, pp. 58-60 (DOC Case Management Manual-DOC 100.0002). When an inmate alleges another inmate is an enemy, an investigation is conducted by staff to determine whether the allegation is true. ECF 19-3, p. 5, ¶ 5. If the situation is validated, the inmates are separated until the enemy situation can be remedied either through transfer of one or both of the inmates or by some other suitable alternative. *Id.*, ¶ 6. In the case where inmates have a serious physical altercation, they are considered enemies until interviewed by custody or case management staff for potential

addition to their enemy lists. *Id.*, ¶ 7. In accordance with the case management manual, an enemy may not be added to a requesting inmate's enemy list unless verified. *Id.*, ¶ 8; ECF 19-3, p. 60. As of the filing of defendants' dispositive motion, plaintiff had 7 verified enemies on his enemy list. ECF 19-3, p. 5, ¶ 9; ECF 19-3, p. 56 (Enemy Alert and Retraction Screen). Plaintiff is currently housed at WCI and, at the time of the filing of defendants' dispositive motion, none of plaintiff's verified enemies were housed at WCI. ECF 19-3, p. 5, ¶ 11.

Butler and Smith each aver that neither of them nor, to their knowledge, any other correctional officer has threatened to assign or actually assign plaintiff to a cell with a known enemy. ECF 19-3, p. 10, ¶ 5 (Butler Decl.); ECF 19-3, p. 12, ¶ 5 (Smith Decl.). Gainer also denies threatening to assign or actually assigning plaintiff to a cell with a known enemy. ECF 19-3, p. 5, ¶ 12. Weber and Graham aver that each has never willfully ignored a documented threat to plaintiff's safety. ECF 19-3, p. 2, ¶ 8 (Weber Decl.); ECF 19-3, p. 224, ¶ 8 (Graham Decl.).

Butler, Chief of Security at WCI, and Smith, Housing Unit #4 manager at WCI, aver that cells located at Housing Unit #4 are all double celled, except for a few designated handicapped single cells. ECF 19-3, p. 9, ¶¶ 1, 3 ECF 19-3, p. 11, ¶¶ 1, 3. When an inmate assaults another inmate, they are identified as verified enemies and placed on each inmate's "Enemy Alerts and Retractions" screen on the "Offender Case Management System (OCMS)." ECF 19-3, p. 9, ¶ 4; ECF 19-3, p. 11, ¶ 4. Inmates can sign an enemy retraction. *Id.* Where both inmates sign the retraction indicating they do not consider the other inmate to be an enemy, then the designation of enemy may be removed by case management. *Id.* In the event one inmate refuses to sign the retraction, then the inmates remain assigned as enemies. *Id.*

On December 18, 2016, the Internal Investigation Division ("IID") of DPSCS was contacted as a result of plaintiff's reporting to a nurse, while he was being treated for a possible seizure, that he was sexually assaulted by his cellmate. ECF 19-3, p. 132. Lt. McKenzie attempted to interview plaintiff, but he refused to be interviewed. *Id*.

Plaintiff was transported to the Western Maryland Regional Medical Center for a sexual assault examination. *Id*. Examination revealed that plaintiff had a one-centimeter abrasion to his left cheek, two four-centimeter abrasions to his left inner wrist, a two-centimeter abrasion to his left shoulder, pain in both knees, and two circular shaped, purple colored bruises to his right inner knee. *Id*., pp. 138-139, 193. No evidence of anal/rectal trauma was noted, and no signs of sperm or seminal fluid were found. *Id*., p. 139, 191. The investigator retrieved plaintiff's white thermal shirt which had blood on the sleeve. *Id*., p. 139.

Plaintiff's cellmate declined to waive his rights to an attorney in order to be interviewed. *Id*., pp. 139, 199. The investigator noted, however, that the cellmate had dried blood and a puncture to the top of his head and scratches on his nose, cheek, and right inner arm. *Id*., p. 139; *see also* ECF 19-3, p. 170.

Prior to being interviewed by IID, plaintiff told the nurse at WCI that his cellmate beat him in the head, and he alleged there was anal penetration and fellatio during the attack.[7] *Id*., p. 140, 153. He also reported that his assailant ejaculated in his mouth. *Id*.

The investigator interviewed plaintiff, who advised that on December 16, 2016, after count, his cellmate produced a weapon and told plaintiff that if he did not perform oral sex he would kill him. ECF 19-3, p. 140. Plaintiff did as instructed, reporting that his assailant wore a blue glove finger for protection. Plaintiff reported that the same thing happened the following

---

[7] Plaintiff denies that this interview occurred. ECF 25-1 at 9.

day and he was unsure if his assailant had ejaculated.  *Id*.  Plaintiff reported that on December 18, 2016, his assailant "told him he wanted some 'ass' and when he told him no his cellmate began to assault him."  *Id*.  Plaintiff advised the investigator that he told Officer Imer he wanted to see a lieutenant but his request was declined.  Plaintiff stated that he had boxers on and his cellmate got on his back.  Plaintiff denied there being penetration but also stated that he passed out so he was not sure if anything happened.  *Id*.  Plaintiff reported that during the struggle he grabbed his assailant's hand, which caused the assailant to stab himself in the head. *Id*.  The investigator closed the case with a finding of "unsubstantiated" and referred the case to the Allegany County State's Attorney's Office for their review and recommendations.  *Id*., p. 141.  The State's Attorney's Office declined to charge plaintiff's cellmate in relation to the alleged sexual assault.  ECF 19-4.

### 4.    Retaliation

Defendants deny retaliating against plaintiff.  Butler and Smith each aver that neither they nor, to their knowledge, did any other officer retaliate against plaintiff for using the prison grievance or court system.  ECF 19-3, p. 10, ¶ 5; ECF 19-3, p. 12, ¶ 5.  Gordon also denies falsifying mental health reports or records or retaliating against plaintiff.  ECF 19-3, p. 7 ¶ 4. Weber states that he never filed a false report against plaintiff and did not conspire with officers or case managers to maintain or determine plaintiff's segregation status.  ECF 19-3, p. 3, ¶¶ 6, 7. Graham avers that he has never filed a false report against plaintiff or conspired with officers or case management to maintain plaintiff's segregation status or cell assignment.  ECF 19-3, p. 224, ¶ 7. Gainer also denies retaliating against plaintiff for using the prison grievance or court systems.  ECF 19-3, p. 5, ¶ 12.

Mellott and Broadwater were not employed at WCI during the time complained of in plaintiff's complaint. Denny Mellott retired from state service on January 1, 2016. ECF 19-3, p. 1, ¶ 2 (Winters Decl.). Jerry Broadwater left state service on June 9, 2011. *Id.*[8]

## II. Standard of Review

### A. Motion to Dismiss

The purpose of a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

### B. Motion for Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in part:

---

[8] Plaintiff concedes that he has misidentified these defendants. ECF 22 at 5 ("Plaintiff can still identify 'Jon Doe' sergeant Broadwater on sight, but still left in the dark as to correct: 8-4 shift commander (whos not Mjr. Denny Mellott)" (sic)).

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In *Anderson*, the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Catrett*, 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing the existence of a genuine issue of material fact for trial.

### III. Discussion

#### A.    Exhaustion

Defendants raise the affirmative defense that plaintiff has failed to exhaust his administrative remedies. If plaintiff's claim has not been properly presented through the administrative remedy procedure, then it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. The PLRA provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, _____ U.S. _____, 136 S. Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Blake*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative

review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Blake*, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." 136 S. Ct. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

The Supreme Court stated in *Blake* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).

Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann., Corr. Servs. ("C.S.") §§ 10-201 *et seq.* (2008 Repl. Vol.); Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; OPS.185.0002.02.[9]

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(b). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02. There is an established administrative remedy

---

[9]     OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive") available for review at http://itcd.dpscs.state.md.us/PIA. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see also* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

procedure process that applies to all Maryland prisons. OPS.185.0002.02. Therefore when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official," OPS.185.0002.05C(1), which is defined by C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." In the DOC, each facility's warden is responsible for the ARP at the institutional level. OPS.185.0002.05E. Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. OPS.185.0002.05J.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP. The prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee. OPS.185.0002.05L. For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. *Id.*

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the

Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code Ann., State Gov't §§ 10-101 et seq.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A. However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g.*, *Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds). In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *See Kitchen v. Ickes*, Civil

Action No. DKC-14-2022, 2015 WL 4378159, at *8 (D. Md. July 14, 2015); *see also Miller v. McConneha, et al*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D. Md. November 11, 2015); *Kaufman v. Baynard*, CIV.A. 1:10-0071, 2012 WL 844480 (S.D.W. Va. Feb. 3, 2012), *report and recommendation adopted*, CIV.A. 1:10-0071, 2012 WL 844408 (S.D. W. Va. Mar. 12, 2012); *Blackburn v. S. Carolina*, No. C A 006-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009) *aff'd*, 404 F. App'x 810 (4th Cir. 2010).

The undisputed evidence demonstrates that plaintiff's mail claim was not properly exhausted before filing this case. On March 27, 2017, plaintiff submitted ARP WCI-0714-17. ECF 1 at 3; ECF 19-3, p. 15. Plaintiff filed the instant case on March 31, 2017. The ARP was dismissed on March 28, 2017, and plaintiff filed his headquarters appeal on April 1, 2017. *Id*. at 16. That appeal was dismissed on April 7, 2017. *Id*. Although plaintiff filed an opposition response to the dispositive motion (ECF 25), he does not dispute that he failed to properly and fully exhaust his mail claim **before** bringing this case. As plaintiff failed to exhaust his administrative remedy in regard to his mail claims prior to instituting his complaint, the complaint shall be dismissed as to plaintiff's mail claims.

The record is less clear as to whether plaintiff exhausted his available administrative remedies as to his claims that defendants failed to protect him from a known risk of harm and retaliated against him. As such, the court shall consider the merits of those claims.

**B.     Failure to Protect**

In order to prevail on an Eighth Amendment claim of failure to protect from violence, plaintiff must establish that defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions

may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with 'evolving standards of decency.' Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury'" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires this

court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id*. at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence'" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844. "In failure-to-protect cases, 'prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.'" *Raynor*, 817 F.3d at 128 (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)).

Here, there is simply no evidence that any of the named defendants were aware of a risk of harm to plaintiff and ignored it. The defendants who were responsible for assigning plaintiff's housing and overseeing his housing unit each deny intentionally placing him in a cell or threatening to place him in a cell with an inmate who posed a threat of harm to his safety.

20

Additionally, it is to be noted that the defendants who plaintiff specifically alleges placed him in the cell with the cellmate who attacked him, Broadwater and Mellot, were in fact separated from state service at that time.

The record evidence demonstrates that policy and procedures regarding the listing of known enemies were followed in regard to plaintiff. When plaintiff was assigned to his cell in December of 2016 there is no indication in the record that defendants were aware or should have been aware that plaintiff's cellmate posed a risk of harm to him. Further, plaintiff claims that he was sexually assaulted by his cellmate over a three-day period; however, there is nothing in the record indicating that, after the first sexual assault, plaintiff notified any prison staff of the assault so that they could take corrective action. Instead, the evidence shows, once staff became aware of the assault, on the third day after plaintiff was taken to the medical department, correctional staff separated plaintiff from his assailant, provided him medical care, and investigated his claim.

While recognizing that advance notification of a substantial risk of assault posed by a particular fellow prisoner is not required to sustain a claim under the Eighth Amendment, *Farmer*, 511 U.S. at 849, the record is devoid of evidence that defendants were subjectively aware that plaintiff was subject to an excessive risk of harm. Plaintiff does not allege that he feared for his safety due particularly to his being placed in the cell with this inmate or that he undertook any effort to notify the defendants or other prison officials that he feared for his safety because of a threat of harm from this cellmate. Nothing suggests that plaintiff told defendants that he was likely to be assaulted by this cellmate or that this cellmate was out to cause him

harm.  Moreover, the cellmate was not on plaintiff's known enemy list, nor was plaintiff on the cellmate's enemy list.  Plainly, the assault was spontaneous and unexpected.

In short, plaintiff has failed to come forth with any evidence that prison officials were, in fact, aware of an excessive risk of harm to his safety.  Defendants are entitled to summary judgment.

### C.    Retaliation

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."  *ACLU of Maryland, Inc. v. Wicomico Cty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)).  A prisoner's claim that prison officials have retaliated against him for engaging in protected conduct is grounded in the First Amendment.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977); *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (*en banc*).  A prisoner's clearly established rights are violated when a prison official retaliates against an inmate for filing a grievance.  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 546 (4th Cir. 2017).

In order to prevail on a claim of retaliation, plaintiff must demonstrate (1) he engaged in protected First Amendment activity, (2) defendants took action that adversely affected him, and (3) a causal relationship between the protected activity and the defendant's conduct.  *See Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017).

To make out a retaliation claim under § 1983, a showing of adversity is essential.  *ACLU of Maryland, Inc.*, 999 F.2d at 785 (citation omitted).  "The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a

substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The inmate must allege facts sufficient to show that the alleged act of retaliation had a chilling effect on his exercise of the right of access to the courts. *ACLU of Maryland,* 999 F.2d at 784. The retaliatory actions must be likely to deter "'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2006) (quoting *Washington v. Cnty. Of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (Sotomayor, J.)).

In the prison context, the plaintiff must establish that the prison authorities' retaliatory action did not advance the institution's legitimate goals of preserving internal order and discipline or that it was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir.1985) (citations omitted). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id*. at 532. Claims of retaliation in the prison context are treated with skepticism "because '[e]very act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

Additionally, plaintiff must demonstrate that the protected activity was the "'but for' cause of the adverse action alleged." *Ridpath v. Bd. Of Governors Marshall Univ*., 447 F.3d 292, 318 (4th Cir. 2006). Causation can be inferred when the adverse action occurs close in time to the plaintiff's engaging in a protected activity. *See Foster v. Univ. of Maryland E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). Defendants can, however, offer legitimate and permissible reasons for their action in order to refute Plaintiff's evidence. *See Guessous v. Fairview Prop.*

*Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016).

Here, plaintiff's conclusional allegations of retaliation in the tampering with his mail and cell assignment fail. The record evidence demonstrates that plaintiff's mail was handled in accordance with DPSCS policy. The record evidence further demonstrates that none of the named defendants retaliated against plaintiff as alleged, tampered with his mail, or threatened him with dangerous cell assignments.

Lastly, plaintiff has failed to demonstrate, as required, any chilling effect as a result of the alleged retaliatory conduct. After the allegedly retaliatory conduct, plaintiff instituted this case along with several others and prosecuted them fully. He also filed additional administrative grievances and prosecuted those to the IGO level. Plaintiff sent and received over 166 pieces of mail from February 1, 2017, through August 2, 2017. In light of the foregoing, plaintiff has failed to demonstrate how the allegedly retaliatory conduct chilled the exercise of his right to access the courts, and his claim, therefore, fails.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss, or in the alternative for summary judgment, will be granted and judgment will be entered in favor of defendants. Plaintiff's complaint against Nurse Monica is dismissed without prejudice. A separate Order follows.

DATED this 28th day of February, 2018.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge